**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

FIREDISC, Inc., *et al.,*

          *Plaintiffs,*

      v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al*.,

         *Defendants.*

Case No. 25-cv-1134

**ORAL ARGUMENT
REQUESTED**

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

John J. Vecchione
Andrew J. Morris*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
john.vecchione@ncla.legal
andrew.morris@ncla.legal

*pro hac vice* motion pending

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

FACTS NOT IN DISPUTE ........................................................................................... 3

    A.   The IEEPA Tariff Executive Orders ............................................................. 3

        1.   The Trafficking Tariffs ........................................................................ 3

        2.   The Reciprocal Tariffs ......................................................................... 5

    B.   The IEEPA Tariffs Have Momentous Economic and Political Effects ......... 7

    C.   The IEEPA Tariffs Are Inflicting Grave Injuries on Plaintiffs .................... 7

STANDARD OF REVIEW ........................................................................................... 9

ARGUMENT ............................................................................................................... 10

   I.   IEEPA DOES NOT EVEN REFER TO TARIFFS ................................................ 10

   II.   IEEPA'S GENERIC GRANT OF AUTHORITY TO REGULATE DOES NOT GRANT AUTHORITY TO IMPOSE TAXES OR TARIFFS ........................................ 11

   III.   IEEPA'S SILENCE CONTRASTS WITH THE MANY SPECIFIC REFERENCES TO TARIFFS IN THE TRADE LAWS THAT DO AUTHORIZE THEM ............................... 15

   IV.   UNDER "MAJOR QUESTIONS" PRECEDENTS, IEEPA'S SILENCE CANNOT BE TRANSFORMED INTO POWER TO IMPOSE TARIFFS ...................................... 16

   V.   LEGISLATIVE HISTORY CONFIRMS THAT IEEPA'S DRAFTERS UNDERSTOOD IT WOULD NOT AUTHORIZE TARIFFS ........................................................... 19

CONCLUSION ............................................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021)......................................................................................... 17

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................... 10

*Biden v. Nebraska*,
  600 U.S. 477 (2023).................................................................................... 16, 22

*Clark v. Martinez*,
  543 U.S. 371 (2005)......................................................................................... 19

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988)......................................................................................... 19

*Emily Ley Paper Co. v. Trump*,
  No. 3:25-cv-464-TKW-ZCB, 2025 WL 1482771 (N.D. Fla. May 20, 2025) ................... 11, 20

*FCC v. Consumers' Research*,
  Nos. 24–354 and 24–422, 2025 WL 177630 (U.S. June 27, 2025)......................... 19

*Feliciano v. Dep't of Transp.*,
  145 S.Ct. 1284 (2025)....................................................................................... 12

*Fischer v. United States*,
  603 U.S. 480 (2024)......................................................................................... 13

*FTC v. Bunte Bros.*,
  312 U.S. 349 (1941)......................................................................................... 14

*Gibbons v. Ogden*,
  22 U.S. (9 Wheat.) 1 (1824)............................................................................. 12

*Gundy v. United States*,
  588 U.S. 128 (2019)......................................................................................... 19

*Lamie v. U.S. Trustee*,
  540 U.S. 526 (2004)......................................................................................... 10

*Learning Resources v. Trump*,
  No. 25-cv-01248-RC, 2025 WL 1525376  (D.D.C. May 29, 2025)................ 11, 12, 13, 15, 16

*Loper Bright Enters. v. Raimondo* and *Relentless v. Dep't. of Com.*,
  603 U.S. 369 (2024)..................................................................................... 2, 10, 22

*Malek v. United States*,
  634 F. Supp. 3d 326 (W.D. Tex. 2022) .............................................................. 3

*McLaughlin Chiropractic Assocs. v. McKesson Corp.*,
  145 S.Ct. 2006 (2025)....................................................................................... 22

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
  595 U.S. 109 (2022) ........................................................................ 14, 17

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) ........................................................................ 12

*Refugee and Immigrant Ctr. for Educ. and Legal Servs. v Noem*,
  No. 25-306-RDM, 2025 WL 1825431 (D.D.C. July 2, 2025) ................ 16

*Sheline v. Dun & Bradstreet Corp.*,
  948 F.2d 174 (5th Cir. 1991) ............................................................ 10

*United States v. Valencia*,
  394 F.3d 352 (5th Cir. 2004) ............................................................ 10

*United States v. Yoshida Int'l, Inc.*
  526 F.2d 560 (C.C.P.A. 1975) ...................................................... 20, 21, 22

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ........................................................................ 15, 18

*Van Loon v. Dep't of Treas.*,
  122 F.4th 549 (5th Cir. 2024) .......................................................... 12

*Webber v. Dep't of Homeland Sec.*,
  CV 25-26-GF-DLC, 2025 WL 1207587 (D. Mont. Apr. 25, 2025) ........ 11

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................................................................ 17, 18

*Yates v. United States*,
  574 U.S. 528 (2015) ........................................................................ 12, 13

*Yoshida Int'l, Inc. v. United States*,
  378 F. Supp. 1155 (Cust. Ct. 1974) .................................................. 20

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ................................................................ 1, 11, 18

U.S. Const. art. I, § 8, cl. 3 ................................................................ 11, 18

U.S. Const. art. I, § 9 ........................................................................ 13

**Statutes**

3 U.S.C. § 301 .................................................................................. 3

19 U.S.C. § 1484 .............................................................................. 13

19 U.S.C. § 1862 .............................................................................. 15

19 U.S.C. § 2132 .............................................................................. 15, 21

19 U.S.C. § 2253 .............................................................................. 15

19 U.S.C. § 2411 .............................................................................. 15

19 U.S.C. § 2483 .............................................................................. 3

50 U.S.C. § 1641 .............................................................................. 3

50 U.S.C. § 1701 ................................................................................................ 10

50 U.S.C. § 1702 ......................................................................................... 10, 13

**Regulations**

E.O. 14,193 (Feb. 1, 2025),
 *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*,
 90 Fed. Reg. 9,113 (Feb. 7, 2025) ............................................................. 4

E.O. 14,194 (Feb. 1, 2025),
 *Imposing Duties to Address the Situation at Our Southern Border*,
 90 Fed. Reg. 9,117 (Feb. 7, 2025) ............................................................. 4

E.O. 14,197 (Feb. 3, 2025),
 *Progress on the Situation at Our Northern Border*,
 90 Fed. Reg. 9,183 (Feb. 10, 2025) ........................................................... 4

E.O. 14,198 (Feb. 3, 2025),
 *Progress on the Situation at Our Southern Border*,
 90 Fed. Reg. 9,185 (Feb. 10, 2025) ........................................................... 4

E.O. 14,228 (Mar. 3, 2025),
 *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the
 People's Republic of China*,
 90 Fed. Reg. 11,463 (Mar. 7, 2025) ........................................................... 5

E.O. 14,231 (Mar. 6, 2025),
 *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*,
 90 Fed. Reg. 11,785 (Mar. 11, 2025) ......................................................... 5

E.O. 14,232 (Mar. 6, 2025),
 *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Southern Border*,
 90 Fed. Reg. 11,787 (Mar. 11, 2025) ......................................................... 5

E.O. 14,257 (Apr. 2, 2025),
 *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute
 to Large and Persistent Annual United States Goods Trade Deficits*,
 90 Fed. Reg. 15,041 (Apr. 7, 2025) ........................................................ 5, 6

E.O. 14,259 (Apr. 8, 2025),
 *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports
 from the People's Republic of China*,
 90 Fed. Reg. 15,509 (Apr. 14, 2025) .......................................................... 6

E.O. 14,266 (Apr. 9, 2025),
 *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*,
 90 Fed. Reg. 15,625 (Apr. 15, 2025) .......................................................... 6

E.O. 14,298 (May 12, 2025),
 *Modifying Reciprocal Tariff Rates to Reflect Discussions with the People's Republic of
 China*,
 90 Fed. Reg. 21,831 (May 21, 2025) .......................................................... 6

E.O. 14,316 (July 7, 2025),
*Extending the Modification of the Reciprocal Tariff Rates,*
90 Fed. Reg. 30,823 (July 10, 2025)........................................................................... 7

*Further Amended Notice of Implementation of Additional Duties on Products of the
People's Republic of China,*
90 Fed. Reg. 11,426 (Mar. 6, 2025)........................................................................... 5

*Implementation of Additional Duties on Products of the People's Republic of China
Pursuant to the President's February 1, 2025 Executive Order Imposing Duties to
Address the Synthetic Opioid Supply Chain in the People's Republic of China,*
90 Fed. Reg. 9,038 (Feb. 5, 2025) ............................................................................. 4

Proclamation 10,886,
*Declaring a National Emergency at the Southern Border of the United States,*
90 Fed. Reg. 8,327 (Jan. 20, 2025)............................................................................ 3

U.S. Customs and Border Protection Notice,
*Amendment to Notice of Implementation of Additional Duties on Products of Canada*
90 Fed. Reg. 11,743 (Mar. 11, 2025)......................................................................... 5

U.S. Customs and Border Protection Notice,
*Amendment to Notice of Implementation of Additional Duties on Products of Mexico,*
90 Fed. Reg. 11,429 (Mar. 6, 2025)........................................................................... 5

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................... 9

**Other Authorities**

*China Trade Summary*, Off. of the U.S. Trade Rep. ..................................................... 7

*Entry Summary and Post Release Processes*, U.S. Customs & Border Protection (last
modified Apr. 10, 2025) ............................................................................................ 13

H.R. Rep. No. 95-459, 95th Cong., 1st Sess. (June 23, 1977).................................... 21

Karen M. Sutter,
*U.S.-China Tariff Actions Since 2018: An Overview,*
Cong. Rsch. Serv. (July 16, 2025)............................................................................. 4

M. Angeles Villarreal,
*The United States-Mexico-Canada Agreement (USMCA),*
Cong. Rsch. Serv. (May 29, 2024) ............................................................................ 4

Memorandum from President Trump to the Secretary of State, et al.,
*America First Trade Policy* (Jan. 20, 2025) ............................................................... 3

*Regulate*, Black's Law Dictionary (4th rev. ed. 1968)............................................ 12

*Remarks Announcing Additional United States Tariff Actions on Foreign Imports,*
The White House (Apr. 2, 2025)............................................................................... 18

*Remarks Announcing Additional United States Tariff Actions on Foreign Imports,*
The White House (April 2, 2025)............................................................................... 7

*Remarks by President Trump at the World Economic Forum*,
THE WHITE HOUSE (Jan. 23, 2025) ................................................................. 7

*Tariff*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968) ................................................ 12

Tom Campbell,
*Presidential Authority to Impose Tariffs*,
83 LA. L. REV. 595 (2023) ......................................................................... 15

*Trade Statistics*, U.S. Customs and Border Protection ........................................... 7, 17

## INTRODUCTION AND SUMMARY OF ARGUMENT

In a flurry of recent Executive Orders, the President has asserted authority to impose new tariffs on any imports, from any country, in any amount he chooses. The President issues, postpones, and rescinds the Executive Orders seemingly at whim. These Executive Orders have upended the tariff system that Congress designed and enacted over a course of decades. But the President lacks the authority to issue any of them. He has dressed the Executive Orders (the "Tariff Executive Orders") in the guise of an "emergency" by citing the International Economic Emergency Powers Act, or "IEEPA." But emergency or no, IEEPA does not authorize tariffs—it has nothing to do with them. The Court should grant summary judgment for Plaintiffs, declare the President's tariff orders unlawful, and, pursuant to the Administrative Procedure Act, vacate the implementing modifications to the Harmonized Tariff Schedules of the United States ("HTSUS").

Plaintiffs are small businesses and an association of small businesses that depend on imports to operate—and as a result are suffering crushing injuries from the IEEPA tariffs. These tariffs are spiking Plaintiffs' costs, devastating their basic business models, and threatening their ability even to remain afloat.

Plaintiffs' claims are ripe for summary judgment because the IEEPA tariffs are unlawful as a matter of law. The Constitution vests exclusive control over tariffs with Congress, U.S. Const. art. I, § 8, cl. 1, and Congress has not granted the President any "emergency" authority to order tariffs. IEEPA's text, structure, and longstanding interpretation all dictate this conclusion. IEEPA authorizes certain economic sanctions to defend Americans against "foreign threats"—but it says nothing about taxing Americans by imposing tariffs. It never mentions the topic. This statutory silence should end the inquiry since the President cannot treat Congress's silence on a topic as an affirmative grant of power. *See Loper Bright Enters. v. Raimondo* and *Relentless v. Dep't of Com.*,

603 U.S. 369, 400 (2024) (stating that ambiguity in statutes should not be read as a delegation to the Executive Branch).

Nor can he fill this silence by citing IEEPA's generic grant of authority to "regulate" certain activities. The law has long distinguished between authority to regulate and authority to tax or impose tariffs. The Constitution itself draws this distinction, and IEEPA's language and structure reinforce it. So does the contrast between IEEPA's silence on tariffs and Congress's explicit uses of "tariff" and "duties" in the detailed statutes where it has granted tariff authority. Historical understanding further confirms the conclusion because none of the seven previous Presidents who have held office since IEEPA was enacted suggested it authorized tariffs.

The President's Executive Orders have disrupted the United States's entire tariff system and triggered chaos in financial markets. They require Americans to pay billions of dollars in tariffs a year, on trillions of dollars of purchases. The major questions doctrine imposes a clear-statement requirement on a claim of such vast Executive power, and IEEPA badly fails that test.

Plaintiffs seek summary judgment on two claims, each challenging all of the tariffs the President has ordered based on IEEPA. Counts I contends that the President acted *ultra vires* by ordering tariffs without statutory authority. Count IV asserts an Administrative Procedure Act claim against the two Defendant agencies and their heads. It asserts that, because the President's Executive Orders were unlawful, the agencies' actions to implement them also were unlawful. The Court should grant summary judgment on both claims. That grant of summary judgment would dispose of the entire Complaint by rendering Counts II and III moot. A proposed order is attached.

2

## FACTS NOT IN DISPUTE

### A.  The IEEPA Tariff Executive Orders

#### 1.  The Trafficking Tariffs

On Inauguration Day, January 20, 2025, the President announced his "America First Trade Policy," issuing a Memorandum on trade issues.[1] It directed key agencies to review existing tariffs and other trade measures, to "Address[] Unfair and Unbalanced Trade." *Id.* § 2. It discussed "our country's large and persistent annual trade deficits" and referred to a possible "global supplemental tariff … to remedy" the trade deficits. *Id.*

Also on Inauguration Day, the President declared an emergency at the U.S.-Mexico border. He described the emergency in a Proclamation, stating that the Mexico border was "overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans."[2] This emergency declaration became the basis of an Executive Order imposing tariffs on products from Mexico which, as explained below, the President issued 12 days later.

On February 1, 2025, President Trump issued three Executive Orders imposing tariffs on imports from Canada, Mexico, and China. Each cited IEEPA as authority.[3] The Mexico Executive

---

[1] Memorandum from President Trump to the Secretary of State, et al., *America First Trade Policy* (Jan. 20, 2025), https://bit.ly/40Nd80v.

[2] Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327, 8,327 (Jan. 20, 2025). Material located on government website is self-authenticating under Fed. R. Evid. 902(1) and (5). *See Malek v. United States*, 634 F. Supp. 3d 326, 337 n.5 (W.D. Tex. 2022).

[3] The Tariff Executive Orders also cited three other statutes for technical or administrative purposes but did not purport to rely on them for authority to order tariffs. They cited the National Emergencies Act, which provides the general framework for declarations of national emergencies but explicitly disclaims granting substantive authority, *see* 50 U.S.C. § 1641; § 604 of the Trade Act of 1974, which is a ministerial statute directing the President to update HTSUS to reflect changes in tariff laws, 19 U.S.C. § 2483; and 3 U.S.C. § 301, which authorizes the President to delegate functions to subordinate officials.

Order cited the emergency declared on Inauguration Day and imposed a 25% tariff on all imports. *See* E.O. 14,194 (Feb. 1, 2025), *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025). The Canada Executive Order declared an emergency because of opioid trafficking, and imposed a 25% tariff, with certain exceptions. E.O. 14,193 (Feb. 1, 2025), *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025); E.O. 14,197 (Feb. 3, 2025), *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 10, 2025) (temporarily pausing Canada Executive Order's tariff). Before these new tariffs, tariffs on goods from Canada and Mexico had been near zero.[4]

The China Executive Order also declared an emergency because of opioid trafficking. E.O. 14,195 (Feb. 1, 2025), *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025). It imposed an incremental tariff of 10%, effective Feb. 4, 2025. *Id.*[5] The Department of Homeland Security and Customs and Border Protection modified the HTSUS accordingly.[6] On February 3, the President delayed the effective date of the Canada and Mexico tariffs for one month. E.O. 14,197, 90 Fed. Reg. 9,183; E.O. 14,198 (Feb. 3, 2025), *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 10, 2025).

---

[4] M. Angeles Villarreal, *The United States-Mexico-Canada Agreement (USMCA)*, Cong. Rsch. Serv. 3 (May 29, 2024) ("NAFTA's market-opening provisions gradually eliminated nearly all tariff and most nontariff barriers on goods and services produced and traded within North America."), https://bit.ly/4lRODrh.

[5] Karen M. Sutter, *U.S.-China Tariff Actions Since 2018: An Overview*, Cong. Rsch. Serv. (July 16, 2025) (in 2023, average tariff rate on imports from China was about 19%), https://bit.ly/3TZdUEd.

[6] *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025).

On March 3, 2025, the President doubled the incremental China tariff to 20%. E.O. 14,228 (Mar. 3, 2025), *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025). *See Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025) (publishing revision to the HTSUS).

On March 4, 2025, the Canada and Mexico tariffs became effective, with U.S. Customs and Border Protection implementing them through modifications of the HTSUS.[7] Also that day, President Trump announced an additional pause on tariffs on items that were covered by the United States-Mexico-Canada Agreement, a 2020 trade agreement.[8]

The Trafficking Tariffs now stand at 25% for imports from Mexico and Canada (with energy imports from Canada at 10%) and 20% on imports from China.

### 2. The Reciprocal Tariffs

On April 2, 2025, the President declared "Liberation Day" and imposed what he deemed "reciprocal" tariffs. E.O. 14,257 (Apr. 2, 2025), *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025). In an Executive Order issued that day, he declared a new national emergency based on "large and persistent annual U.S. goods trade deficits." *Id*. The Executive Order expanded the President's tariff campaign, imposing a reciprocal tariff of at least

---

[7] U.S. Customs and Border Protection Notice, *Amendment to Notice of Implementation of Additional Duties on Products of Canada*, 90 Fed. Reg. 11,743 (Mar. 11, 2025) (modification of the HTSUS for products of Canada); U.S. Customs and Border Protection Notice, *Amendment to Notice of Implementation of Additional Duties on Products of Mexico*, 90 Fed. Reg. 11,429 (Mar. 6, 2025) (modification of the HTSUS for products of Mexico).

[8] E.O. 14,231 (Mar. 6, 2025), *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (Mar. 11, 2025); E.O. 14,232 (Mar. 6, 2025), *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,787 (March 11, 2025).

10% on imports from "all trading partners," while also imposing higher, country-specific reciprocal tariffs on imports from 57 trading partners. *Id.* at 15,045, 15,047, 15,049–50. These Reciprocal Tariffs do not, however, apply to Canada and Mexico. *Id.* at 15,046. The President again cited IEEPA as authority. *Id.* at 15,048.

The Reciprocal Tariffs included a country-specific 34% reciprocal tariff on China. *Id.* at 15,049. This reciprocal tariff is in addition to the Trafficking Tariffs described above. *Id.* at 15,047. The President issued two more Executive Orders raising the reciprocal tariff on imports from China, ultimately to 125%. *See* E.O. 14,259 (Apr. 8, 2025), *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) (increasing the reciprocal tariff on Chinese goods to 84%); E.O. 14,266 (Apr. 9, 2025), *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment,* 90 Fed. Reg. 15,625 (Apr. 15, 2025) (increasing reciprocal tariff on Chinese goods to 125%).

On May 12, 2025, after negotiations with China, President Trump temporarily decreased the reciprocal tariff on Chinese goods to 10% for a period of 90 days. E.O. 14,298 (May 12, 2025), *Modifying Reciprocal Tariff Rates to Reflect Discussions with the People's Republic of China*, 90 Fed. Reg. 21,831 (May 21, 2025) (effective May 14, 2025). The Order modifies the HTSUS accordingly. *Id.* at 21,833. The suspension expires on August 12, 2025. *Id.* at 21,832.

The other country-specific reciprocal tariffs are now temporarily suspended, so that only the 10% universal baseline tariff applies to the countries covered by the April 2, 2025 "Liberation Day" Executive Order. *See* E.O. 14,266, 90 Fed. Reg. at 15,626. The Administration set a goal to reach deals with most countries by July 9, 2025. *Id.* On July 7, 2025, the President extended that

deadline to August 1, 2025. E.O. 14,316 (July 7, 2025), *Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30,823 (July 10, 2025).

### B. The IEEPA Tariffs Have Momentous Economic and Political Effects

These tariffs have had and will have vast financial impact. The United States imports trillions of dollars of goods each year, importing $3.36 trillion in 2024. *Trade Statistics*, U.S. Customs and Border Protection, https://bit.ly/3IvYVil. Imports from China alone were approximately $439 billion. *China Trade Summary*, Off. of the U.S. Trade Rep., https://bit.ly/4nN9gGX (last visited July 18, 2025). According to the Administration, the tariffs imposed by the IEEPA Executive Orders also will be in the trillions of dollars. The President himself acknowledged that his Administration's tariffs "will direct hundreds of billions of dollars and even trillions of dollars into our Treasury." *Remarks by President Trump at the World Economic Forum*, THE WHITE HOUSE (Jan. 23, 2025), https://bit.ly/4nP5D35. The President reiterated these figures in a speech about the "Liberation Day" Tariffs, stating that they will raise "trillions and trillions of dollars to reduce our taxes and pay down our national debt."[9]

### C. The IEEPA Tariffs Are Inflicting Grave Injuries on Plaintiffs

Plaintiffs are two small businesses and an association of small businesses that import products and pay related tariffs. All of them face immense financial harm because of the tariffs at issue in this case.

FIREDISC, Inc. is a Delaware corporation with its principal place of business in Katy, Texas. Jaggard Decl. ¶ 2. A family-owned business, *id.* ¶ 12, it manufactures and sells outdoor cooking products. *Id.* ¶ 2. FIREDISC has made and makes significant purchases from sources in China. *Id.* ¶ 3. The products it imports are not reasonably available from a supplier in the United

---

[9] *Remarks Announcing Additional United States Tariff Actions on Foreign Imports*, THE WHITE HOUSE (April 2, 2025), https://bit.ly/3ItCn1W.

States. *Id*. FIREDISC has paid substantial tariffs and, because of the Tariff Executive Order, will pay higher tariffs and suffer economic injuries including lost profits. *Id*.

The tariff increases have affected nearly every aspect of FIREDISC's business. *Id*. ¶ 4. FIREDISC has made diligent efforts to identify alternative domestic sources for its products and components but has found that no viable U.S.-based manufacturers can supply the required specifications, volumes, or pricing needed to sustain its business. *Id*. ¶ 8.

FIREDISC competes in a market that is highly price-sensitive, so that minor price increases cause material decreases in sales. *Id.* ¶ 4. Already, because of the higher tariffs, FIREDISC has delayed the launch of a major new outdoor cooker. *Id*. ¶ 5. Because of this delay, FIREDISC has lost sales to its competitors, as well as market share at important retailers. *Id*. FIREDISC also is incurring additional costs because it must pay warehousing and related costs for products it has purchased but are warehoused in China because of the tariff increases. *Id*. ¶ 6.

These developments have created severe cash-flow problems for FIREDISC. *Id*. ¶ 7. But the tariffs also are interfering with FIREDISC's efforts to address the cash flow problems by obtaining capital from investors. *Id*. Potential investors have expressed hesitance to invest because of concern about supply chain reliability, uncertainty about costs, and uncertainty about product pricing. *Id*. As a result, the tariffs also are preventing FIREDISC from obtaining the cash it needs to handle the other problems the tariffs cause. *Id*. FIREDISC is now in survival mode and attempting to remain afloat. *Id*. ¶ 13.

The Game Manufacturers Association ("GAMA") is a non-profit trade organization representing members of the tabletop games industry in the United States. Stacy Decl. ¶¶ 2–3. This industry generates approximately $10 billion in annual revenue. *Id*. GAMA has approximately 1,500 member companies in 49 states including Texas. *Id*. ¶ 3. Its members employ tens of

thousands of workers—including creators, publishers, manufacturers, and retailers. *Id*. ¶ 4. Nearly 80% of tabletop games sold in the U.S. are manufactured abroad. *Id*. ¶ 5. Most imports are from China, and GAMA's members also rely on manufacturers in countries including Canada, Poland, Spain, Germany, and the United Kingdom. *Id.* GAMA's members have paid substantial and ongoing tariffs on goods that are not reasonably or affordably available from U.S. suppliers. *Id*. ¶ 6.

Because of the Trafficking Tariffs and Reciprocal Tariffs, businesses throughout the supply chain face mounting financial strain, including diminished profit margins, reduced product availability, and delayed release schedules. *Id*. As a result, dozens of GAMA members have announced layoffs and some have ceased operations. *Id*. In short, these tariffs have damaged and are continuing to damage the health of the tabletop game industry, including GAMA members, and the economic livelihoods it supports. *Id*.

Ryan Wholesale, Inc. is a Florence, Texas based manufacturer and seller of structural timber trusses and other fine wood products. Foxworth Decl. ¶ 2. Ryan Wholesale has made and makes significant purchases from sources in Italy. *Id*. ¶ 3. The products it imports are not reasonably available from a supplier in the United States. *Id*. Ryan Wholesale has paid increased tariffs because of the Reciprocal Tariffs and will continue to pay higher tariffs and suffer economic injuries including lost profits as a result. *Id*. ¶ 4; *see also id.* ¶ 5. *See* documentation of tariff payment attached as Foxworth Decl. Ex. 1.

## STANDARD OF REVIEW

The Court should grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"[S]ummary judgment is appropriate where the only issue before the court is a pure question of law," *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991) (citation omitted), and the interpretation of a statute is a question of law, *United States v. Valencia*, 394 F.3d 352, 354 (5th Cir. 2004) (citation omitted).

## ARGUMENT

### I.    IEEPA DOES NOT EVEN REFER TO TARIFFS

IEEPA authorizes the President to take certain actions after declaring a national emergency because of an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a). The subparagraph at issue here, 50 U.S.C. § 1702, identifies the permitted actions. It authorizes the President to investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit" certain transactions and property. 50 U.S.C. § 1702(a)(1)(B) (emphasis identifying language relied on by Defendants). It then identifies the categories of transactions and property the authorized actions may address

> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id.* (emphasis identifying language relied on by Defendants).

Conspicuously absent from this detailed subparagraph is any reference to tariffs, imposts, duties, or taxes. That absence should defeat the President's assertions that IEEPA authorizes tariffs because statutory silence cannot be construed as a delegation of authority—as the Supreme Court very recently emphasized. *See Loper Bright*, 603 U.S. at 400. The courts will also not read absent words into a statute. *Lamie v. U.S. Trustee,* 540 U.S. 526, 538 (2004) (noting the canon against

adding absent words to a statute and stating, "With a plain, nonabsurd meaning in view, we need not proceed in this way").

## II.    IEEPA'S GENERIC GRANT OF AUTHORITY TO REGULATE DOES NOT GRANT AUTHORITY TO IMPOSE TAXES OR TARIFFS

Section 1702's reference to "regulate" cannot negate this silence. Authority to "regulate" is not authority to impose taxes, including tariffs. The effort to stretch "regulate" to authorize tariffs conflicts with a long list of historical and textual evidence. This is the conclusion reached by the only other court that has analyzed the "regulate" argument in the context of tariffs. In that case, *Learning Resources v. Trump*, No. 25-cv-01248-RC, 2025 WL 1525376, at *13 (D.D.C. May 29, 2025), *appeal docketed*, No. 25-5202 (D.C. Cir. May 30, 2025), *petition for cert. before judgment filed*, No. 24-1287 (U.S. June 17, 2025), the United States District Court for the District of Columbia held that the "statutory phrase 'regulate ... importation,' as used in IEEPA, does not encompass the power to tariff."[10]

To begin, Defendants' reading of "regulate" to authorize tariffs ignores the categorical distinction the Constitution itself draws between regulating and taxing. The Constitution uses separate clauses to assign those two powers. First, referring to tariffs as "imposts," the Taxing Clause assigns Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. The separate Commerce Clause assigns Congress the "Power … To regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. The Framers would not have placed these powers in separate clauses if, as Defendants contend, the power to "regulate" included the

---

[10] Two other district courts have considered whether IEEPA authorizes tariffs, but they relied on inapposite and outdated authority rather than an analysis of the statute. The courts in *Emily Ley Paper Co. v. Trump*, No. 3:25-cv-464-TKW-ZCB, 2025 WL 1482771, at *4–*6 (N.D. Fla. May 20, 2025), and *Webber v. Dep't of Homeland Sec.*, CV 25-26-GF-DLC, 2025 WL 1207587, at *5 (D. Mont. Apr. 25, 2025), concluded that IEEPA provides for tariffs, but both based their decisions primarily on the 1975 decision in *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975). As explained below in section V, *Yoshida* is nonbinding and is irrelevant to this case.

power to impose imposts or tariffs. *See Learning Res.*, 2025 WL 1525376, at *8 ("the power to regulate is not the power to tax"). If the power to "regulate" did include those powers, then the entire Taxing Clause would be surplusage. *See Feliciano v. Dep't of Transp.,* 145 S.Ct. 1284, 1294 (2025) (applying canon against surplusage to reject government's reading of statute).

The Constitution's distinction reflects ordinary usage. *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) (stating that "this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them"). According to Black's Law Dictionary, "tariff" means a "custom or duty payable on … articles." *Tariff*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968) (also specifying that they are "imposed upon their importation into the United States"). By contrast, to "regulate" is to "fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Regulate*, BLACK'S LAW DICTIONARY (4th rev. ed. 1968). Chief Justice Marshall followed this usage when he described the power to "regulate" as the power "to prescribe the rule by which [an activity] is to be governed." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196 (1824) (describing the power to regulate commerce). *See Learning Res.*, 2025 WL 1525376, at *8 ("'Tariff' and 'regulate' also take different plain meanings."). The Fifth Circuit has repeatedly stressed plain meaning of statutory language, including when addressing IEEPA. *See, e.g.*, *Van Loon v. Dep't of Treas*., 122 F.4th 549, 563 (5th Cir. 2024) (citation omitted) (under IEEPA, rejecting the government's broad reading of "property" in § 1702(a)(1)(B)) ("Where a statute leaves terms undefined, we accord those terms their 'ordinary, contemporary, common meaning.'").

The statutory context shows that. IEEPA confined "regulate" to the same meaning it takes in the Constitution and ordinary usage. The "words immediately surrounding" a statutory term "cabin the contextual meaning of that term." *Yates v. United States*, 574 U.S. 528, 543 (2015). *See*

*also Fischer v. United States*, 603 U.S. 480, 487 (2024) (describing the basic interpretive principles of *ejusdem generis* and *noscitur a socii*). In § 1702(a)(1)(B) and in IEEPA, the words immediately surrounding "regulate" describe authorized actions that relate to economic sanctions: investigating, blocking, negating, or controlling a problematic activity. These neighboring words "cabin the contextual meaning," *Yates*, 574 U.S. at 543, of "regulate" to the same meaning reflected in the Constitution and described in Black's Law Dictionary, which does not include the power to tax. This was the conclusion reached by the *Learning Resources* court, which explained that "[t]he other verbs in Section 1702(a)(1)(B) confirm that the President's power to 'regulate … [the] importation or exportation' of property does not encompass the power to tariff." 2025 WL 1525376, at *9.

IEEPA's text contains still other proof that "regulate" cannot properly be read to authorize tariffs. For example, if the statutory authority to "regulate … importation *or exportation*," 50 U.S.C. § 1702(a)(1)(B), included the power to tax, it would violate the Constitutional prohibition on taxing exports. *See* U.S. Const. art. I, § 9 ("No Tax or Duty shall be laid on Articles exported from any State."). *See Learning Res.*, 2025 WL 152376, at *11 (reading "regulate" to authorize tariffs would authorize tariffs on exports and therefore render IEEPA unconstitutional).

Defendants' broad reading of "regulate" also conflicts with § 1702(a)(1)(B)'s limitation of the President's IEEPA authority to "property in which [a] foreign country or a national thereof has [an] interest." 50 U.S.C. § 1702(a)(1)(B). Tariffs are imposed on property purchased by a buyer located in the United States. *See* 19 U.S.C. § 1484(a)(2)(B) (generally authorizing the "owner or purchaser" of goods to be the importer of record); *Entry Summary and Post Release Processes*, U.S. Customs & Border Protection (last modified Apr. 10, 2025), https://bit.ly/3GBjYQ6 ("Within 10 days of the release of the cargo, the importer must pay the estimated duties on their imported

goods."). Most buyers located in the United States are U.S. nationals, and IEEPA does not provide the President any authority over them or their property. Reading "regulate" to authorize imposing tariffs on these U.S. nationals conflicts with § 1702(a)(1)(B)'s plain language.

More broadly, reading "regulate" to authorize tariffs or taxes would render § 1702(a)(1)(B) nonsensical, since this provision applies "regulate" to a vast range of transactions and property including any covered "acquisition," "holding," "withholding," "use," "transfer," "withdrawal," "transportation" "importation or exportation of [property]," "dealing in [property]," "exercising any right, power, or privilege with respect to [property]," or "transactions involving [property]." If Defendants' broad reading of "regulate" were correct, then § 1702(a)(1)(B) would authorize the President to impose taxes on all of these transactions and property—an obviously absurd result. More broadly still, if authority to "regulate" included the authority to tax, then every Congressional grant of authority to "regulate" would empower the grantee agency to tax the activities the agency regulates. The power of many federal agencies would, to say the least, be vastly expanded.

Historical practice further confirms the conclusion. A "want of assertion of power by those who presumably would be alert to exercise it" is "significant in determining whether such power was actually conferred." *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941). And in the decades since Congress passed IEEPA in 1977, none of the seven presidents that preceded President Trump suggested it authorized him to order tariffs. This "lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling indication that the [tariffs] extend[] beyond the [President's] legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022) (per curiam) (cleaned up). The *Learning Resources* court also found this history compelling, concluding that "[h]istorical practice

14

further indicates that IEEPA does not encompass the power to levy tariffs." *Learning Res.*, 2025 WL 1525376, *10.

## III.    IEEPA'S SILENCE CONTRASTS WITH THE MANY SPECIFIC REFERENCES TO TARIFFS IN THE TRADE LAWS THAT DO AUTHORIZE THEM

IEEPA's silence on tariffs contrasts with the specific references to "tariffs" and "duties" Congress has used in actual tariff statutes, showing that Congress "speak[s] clearly" when it authorizes tariffs. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). For example, § 203 of the Trade Act of 1974 authorizes the President to "proclaim an increase in, or the imposition of, any *duty* on the imported article" or **"**proclaim a *tariff*-rate quota on the article." 19 U.S.C. §§ 2253(a)(3)(A), (B) (emphases added). Section 301 of the Trade Act of 1974 authorizes the President to "impose *duties* or other import restrictions." 19 U.S.C. § 2411(c)(1)(B) (emphasis added). And § 232 of the Trade Expansion Act refers to authority to change the level of "*duties*" on imports. 19 U.S.C. § 1862(a) (emphasis added). IEEPA contains no similar language.

Also in contrast to IEEPA, tariff laws carefully cabin the granted authority with procedural and substantive conditions. For example, § 301 of the 1974 Trade Act authorizes certain tariffs only if warranted to address a country's specific violation of a trade agreement, *see* 19 U.S.C. § 2411. Section 122 of the Trade Act of 1974 authorizes the President to impose duties "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a). Section 122 limits the amount and duration of any duties, which may "not [] exceed 15 percent ad valorem" and shall expire after 150 days unless Congress enacts legislation to extend them. *Id*. Tariff statutes generally require fact-finding and other procedures by an agency such as the U.S. Trade Representative, the International Trade Commission, or the Department of Commerce. For examples of typical requirements in key tariff statutes, see Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 LA. L. REV. 595, 614–16 (2023) (arguing IEEPA does not authorize tariffs).

15

IEEPA contains no similar limitations. The *Learning Resources* court found the contrast between IEEPA and tariff statutes a further indication that IEEPA does not authorize any tariffs. *Learning Res.*, 2025 WL 1525376, at *9 ("Nor does IEEPA include language setting limits on any potential tariff-setting power."). *See Refugee and Immigrant Ctr. for Educ. and Legal Servs. v. Noem*, No. 25-306-RDM, 2025 WL 1825431, at *32, *35 (D.D.C. July 2, 2025) (provision in the Immigration and Nationality Act authorizing the President to "suspend the entry" of certain aliens, does not authorize the President to bypass an entire "system" of "detailed provisions" governing asylum, removal, and related matters), *appeal filed*, No. 25-5243 (D.C. Cir. July 3, 2025).

## IV.    UNDER "MAJOR QUESTIONS" PRECEDENTS, IEEPA'S SILENCE CANNOT BE TRANSFORMED INTO POWER TO IMPOSE TARIFFS

The conclusion that IEEPA did not authorize tariffs is further confirmed by a series of recent Supreme Court decisions striking down Executive Branch efforts like the one challenged in this case: attempts that cite general statutory language, in an inventive way, to claim authority that is sweeping and unprecedented. The decisions have applied the major questions doctrine, which requires a showing of "clear congressional authorization" for the authority the President claims. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

Most recently, the Supreme Court invalidated a Biden Administration plan to forgive approximately $400 billion of student loans. *Biden v. Nebraska*, 600 U.S. 477. The Court held that the HEROES Act—a national emergency statute passed in the wake of 9/11—did not authorize the Administration's plan. *Id*. at 506. Statutory language authorizing the Secretary to "waive or modify" certain loan provisions was not sufficiently "clear" and "explicit" to support the Administration's massive loan forgiveness program. *Id*. at 492, 500, 504.

A year earlier, the Court rejected EPA's effort to reinterpret the 1970 Clean Air Act as authority to force the nation's power plants to transition away from coal. *West Virginia v. EPA*,

597 U.S. 697 (2022). The Court stressed that EPA had claimed to discover an unprecedented and transformative power in decades-old general statutory language, *id*. at 721, 724, then concluded EPA had failed to "point to 'clear congressional authorization' for the power it claims," *id.* at 723 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

Also in 2022, the Court struck down OSHA's attempt to mandate nationwide Covid vaccines or testing by invoking its general authority to set "occupational safety and health standards." *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117. The Court held that those sweeping measures could not rest on such general statutory terms, but required "clear" congressional authorization. *Id*.

In 2021, the Court invalidated the Center for Disease Control's nationwide eviction moratorium. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). The CDC cited its statutory authority "to prevent the introduction, transmission, or spread of communicable diseases," and to require specific measures such as "inspection … disinfection" as well as "other measures, as in [its] judgment may be necessary." *Id*. at 761 (citation omitted). Again, this use of the statute was unprecedented. *Id*. at 761. The Court rejected the attempt. It held that the "sheer scope of the CDC's claimed authority" required the agency to show "clear" congressional authorization, which the statute did not provide. *Id*. at 764.

The pattern evident in these reversals of executive branch actions is glaring in the tariff Executive Orders. President Trump has made "vast" assertions of presidential authority, restructuring fundamental trade policy toward the entire world. These tariffs have "vast economic ... significance." *West Virginia*, 597 U.S. at 716 (citation omitted). United States imports totaled at least $3.36 trillion in 2024, *Trade Statistics*, U.S. Customs and Border Protection,

https://bit.ly/3IvYVil, and the President himself puts the effect of his tariffs in "trillions and trillions of dollars."[11]

The President also is asserting a power that was "unheralded" for the first 47 years IEEPA was in effect, because none of the seven other presidents (four Democrats and three Republicans) who have served since IEEPA was enacted have suggested it authorizes tariffs. *West Virginia*, 597 U.S. at 724 (citation omitted); *Util. Air Regul. Grp.*, 573 U.S. at 324 ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (cleaned up).

Also in this case, Defendants attempt to rely on a general term that does not provide the required "clear" authority. To say the least, the word "regulate" is not a "clear" delegation of Congress's core power over tariffs—especially given that the Constitution distinguishes between "regulate" and "tariffs," and that IEEPA provides extensive textual evidence that should rule out that reading.

Finally, the imposition of these massive tariffs—reordering the basic structure of the nation's tariff laws—is a matter of great "political significance." *West Virginia*, 597 U.S. at 716 (citation omitted). As a constitutional matter, tariffs have the highest level of political significance because determining tariffs and regulating foreign commerce are core Congressional powers, specifically enumerated in the Constitution. *See* U.S. Const. art. I, § 8, cl. 1 (Taxation Clause) and U.S. Const. art. I, § 8, cl. 3 (Commerce Clause). The principles of the major questions doctrine

---

[11] *Remarks Announcing Additional United States Tariff Actions on Foreign Imports*, THE WHITE HOUSE (Apr. 2, 2025), https://bit.ly/4lsFMwg.

apply squarely to this case, and they establish that IEEPA does not provide the clear statutory statement that is necessary to authorize the President to order tariffs.

This conclusion is reinforced by the principle of constitutional avoidance, which holds that courts should construe statutes to avoid "rais[ing] serious constitutional problems." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Constitutional problems would arise if "regulate" were construed to refer to tariffs, because under that construction, IEEPA would authorize tariffs that are essentially unlimited—in amount or by product, industry, or country. That unlimited grant of authority would violate the nondelegation doctrine's requirement for an "intelligible principle to guide the [President's] use of discretion," *Gundy v. United States*, 588 U.S. 128, 135 (2019). *See also FCC v. Consumers' Research*, Nos. 24–354 and 24–422, 2025 WL 1773630, at *8 (U.S. June 27, 2025) (citation omitted) ("we have asked if Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law.")).

Because IEEPA cannot be construed to grant *unlimited* tariff authority without violating the nondelegation doctrine, but IEEPA does not place limits on any tariff authority, it follows that IEEPA cannot be construed to grant *any* tariff authority at all. The principle of constitutional avoidance thus provides further support for the conclusion that Congress did not understand "regulate … importation" to authorize tariffs. *See Clark v. Martinez*, 543 U.S. 371, 382 (2005) (the principle of constitutional avoidance is a "means of giving effect to congressional intent" by presuming that Congress meant to enact a statute that was constitutional).

## V.    LEGISLATIVE HISTORY CONFIRMS THAT IEEPA'S DRAFTERS UNDERSTOOD IT WOULD NOT AUTHORIZE TARIFFS

IEEPA's legislative history should not be relevant in this case. In any event, it supports Plaintiffs' reading of IEEPA, not the Administration's.

Defendants note that Congress adopted the key IEEPA language from IEEPA's predecessor statute, the Trading with the Enemy Act ("TWEA"), and based on that fact contend that IEEPA's legislative history indicates IEEPA authorizes tariffs. *See*, *e.g.*, Def.'s Resp. to Pl.s Mot. for P.I., ECF No. 16, *Learning Resources, Inc. v. Trump*, No. 1:25-cv-01248-RC (D.D.C. May 1, 2025), at 16–18. But the legislative history shows the opposite: that Congress understood the TWEA language later included in IEEPA did not authorize tariffs. The most relevant history begins in 1971, when President Nixon responded to an economic crisis involving a declining gold reserve and "worsening balance of payments deficit" by ordering a 10% tariff surcharge on imported goods. *United States v. Yoshida Int'l, Inc.* 526 F.2d 560, 567 (C.C.P.A. 1975). He cited two tariff statues as authority, but when an importer challenged the tariff as unauthorized by Congress, *id*. at 566, the Department of Justice defended it by citing TWEA (which President Nixon's Proclamation did not cite), *id*. at 569–70 (addressing TWEA). *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, *passim* (Cust. Ct. 1974), *rev'd*, *Yoshida*, 526 F.2d at 576. The Customs Court held that TWEA did not authorize the tariff, 378 F. Supp. at 1175–76, but on appeal the Court of Customs and Patent Appeals found that it did, *Yoshida*, 526 F.2d at 576.[12] As explained below, however, the court reached that conclusion on a basis that distinguishes the decision from this case.

Congress reacted to the Executive Branch's reliance on TWEA by showing it disagreed that TWEA had authorized the tariff. It enacted legislation authorizing the President to impose an "import surcharge [tariff] ... in the form of duties ... on articles imported into the United States" to

---

[12] Any case finding for the government on these IEEPA tariffs has resorted to *Yoshida*, whether bound by it or not, and with no effort to apply modern statutory construction—absent in *Yoshida*— to the current IEEPA statute. *See Emily Ley Paper, Inc.*, 2025 WL 1482771, at *4–*6 (ordering transfer to CIT, citing the Court of Customs and Patent Appeals *Yoshida* decision).

"deal with large and serious United States balance-of-payments deficits." *See* § 122 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 1987-88 (1975), 19 U.S.C. § 2132(a). Congress would not have enacted this legislation if it believed TWEA already authorized the President to impose tariffs in case of such "large and serious … balance-of-payments deficits."

Congress enacted IEEPA two years later, adopting language from TWEA in 50 U.S.C. § 1702(a)(1)(B). Legislative history shows Congress understood that this language did not authorize tariffs. The House Report set out an exhaustive description of the powers IEEPA would grant the President, but did not refer to tariffs or anything like them. H.R. Rep. No. 95-459, 95th Cong., 1st Sess. at 2 (June 23, 1977). This omission alone should defeat the assertion that Congress understood IEEPA authorized tariffs. The House Report also specifically criticized the Nixon tariff as unauthorized by TWEA. *Id.* at 5 (describing tariff). Referring to the Nixon tariff and other presidential acts, the Report complained that TWEA had "become essentially an unlimited grant of authority for the President to exercise, at his discretion," *id.* at 7.

This historical evidence that Congress did not view IEEPA as authorizing tariffs is one of several reasons *Yoshida* is not relevant here. First, *Yoshida* addresses TWEA rather than IEEPA. And as just explained, when Congress replaced TWEA with IEEPA, it understood that IEEPA did not authorize tariffs. Second, *Yoshida* is distinct on its facts. The Nixon Proclamation at issue in that case expressly incorporated detailed statutory limits on tariffs contained in the HTSUS. 526 F.2d at 567–68. By contrast, the Executive Orders challenged in this case acknowledge no similar limitations on the President's tariff authority.[13]

---

[13]     Finally, *Yoshida* is not valid persuasive authority. The court construed statutory silence as a grant of executive power, stating that "*nothing* in the TWEA or in its history … specifically *either authorizes or prohibits* the imposition of a surcharge." 526 F.2d at 572–73 (emphasis added). It construed this indeterminate language in the President's favor, stating that

## CONCLUSION

As the Supreme Court has done in so many recent decisions, this Court should reject the Executive's effort to construe one vague word, taken out of context, as a delegation of vast power to impose new obligations on the American people. Accordingly, Plaintiffs respectfully ask the Court to enter summary judgment for Plaintiffs on Counts I and IV.

July ☐, 2025

Respectfully submitted,

*/s/ John J. Vecchione*
John J. Vecchione
Andrew J. Morris*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Tel.: (202) 869-5210
Fax: (202) 869-5238
john.vecchione@ncla.legal
andrew.morris@ncla.legal

* *Pro hac vice* application pending

*Counsel for Plaintiffs*

---

"regulate" "*can*" include imposing duties, *id.* at 575, then noted that TWEA legislative history did not "indicate[] an intent to *prohibit*" tariffs. *Id.* at 576 (emphasis added).

This method of analysis violates principles of statutory construction emphasized in Supreme Court decisions since 1975. In particular, the major questions doctrine requires that the executive branch must identify a clear statutory statement to justify an assertion of power. *See Biden v. Nebraska*, 600 U.S. at 516 (Barrett, concurring) (tracing major questions doctrine to 1980). Consistent with that doctrine, *Loper Bright* prohibits courts from construing statutory silence or ambiguity as a grant of authority. 603 U.S. at 400; *see also McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 145 S.Ct. 2006, 2015 (2025) (no deference is "default rule").

## REQUEST FOR ORAL ARGUMENT

Plaintiffs hereby request oral argument.

*/s/ John J. Vecchione*
John J. Vecchione

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| FIREDISC, Inc., *et al.,* | |
| *Plaintiffs,* | Case No. <u>25-cv-1134</u> |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants*. | |

## <u>DECLARATION OF GRIFF JAGGARD</u>

I, Griff Jaggard, pursuant to 28 U.S.C. § 1746, declare as follows in support of Plaintiffs' Motion for Summary Judgment in the above-captioned action:

1.   I am the President and Chief Executive Officer of FIREDISC, Inc. ("FIREDISC"), a Plaintiff in this matter.

2.   FIREDISC, Inc. is a Delaware corporation with its principal place of business in Katy, Texas. It manufactures and sells outdoor cooking products.

3.   FIREDISC has made and makes significant purchases from sources in China. The products it imports are not reasonably available from a supplier in the United States. FIREDISC has paid substantial tariffs and, because of the Trafficking Tariffs and Reciprocal Tariffs, will pay higher tariffs and suffer economic injuries including lost profits.

4.     The tariff increases have affected nearly every aspect of FIREDISC's business. FIREDISC competes in a market that is highly price-sensitive, so that minor price increases cause material decreases in sales. So increasing prices to cover the tariffs will cause significant loss of sales and profits.

5.     Already, because of the higher tariffs, FIREDISC has delayed the launch of a major new outdoor cooker, for which many customers already had expressed interest. Because of this delay, FIREDISC has lost sales to its competitors, as well as market share at important retailers.

6.     FIREDISC also is incurring additional costs because it must pay warehousing and related costs for products it has purchased but are warehoused in China because of the tariff increases.

7.     These developments have created severe cash-flow problems for FIREDISC. The tariffs also are interfering with FIREDISC's efforts to address the cash flow problems by obtaining capital from investors. Potential investors have expressed hesitance to invest because of concern about supply chain reliability, uncertainty about costs, and uncertainty about product pricing. As a result, the tariffs also are preventing FIREDISC from obtaining the cash it needs to handle the other problems the tariffs cause. This problem shows the chilling effect the tariffs have had on both current and prospective investors. Unlike larger corporations, FIREDISC does not have access to extensive lines of credit or large cash reserves that could stabilize operations during macroeconomic disruptions. Financial institutions are increasingly reluctant to extend credit to small import-reliant businesses due to the unpredictability caused by the current tariff regime. This results in a compounding hardship: lack of investor interest and lack of institutional financing. Despite having promising product innovations and growing market demand,

FIREDISC is unable to secure capital needed for growth because investors view the ongoing trade environment as unpredictable and high-risk. This stifles innovation, expansion, and long-term viability.

8. FIREDISC has made diligent efforts to identify alternative domestic sources for its products and components but has found that no viable U.S.-based manufacturers can supply the required specifications, volumes, or pricing needed to sustain its business. Thus, the tariffs do not serve to encourage domestic sourcing for FIREDISC, but instead function solely as a penalty with no alternative path available.

The impact of the tariffs disproportionately harms small businesses like FIREDISC, which lack economies of scale and cannot easily diversify their supply chains or shift production without incurring prohibitive costs. While larger corporations can absorb or redistribute such impacts across broader product portfolios and global operations. FIREDISC's core business is directly and singularly affected, placing it at an acute competitive disadvantage. This experience is not unique. According to the National Federation of Independent Business (NFIB), 38% of small businesses have delayed investment decisions due to uncertainty surrounding tariffs and trade policy. ^1 FIREDISC's situation reflects a broader systemic hardship facing American small businesses navigating an unpredictable international trade environment where growth and innovation are routinely stalled by policy volatility and supply-chain disruption.

9. FIREDISC's core business is directly and singularly affected, placing it at an acute competitive disadvantage.

10. As a small, local employer, FIREDISC supports not only its internal staff but also a network of contractors, third-party logistics providers, warehousing staff, and marketing professionals, many of whom are based in Texas. The continued financial strain caused by the

tariffs jeopardizes these local jobs and threatens a ripple effect across the small business ecosystem FIREDISC helps support. Moreover, these impacts are not limited to our business alone. Consumers are also bearing the burden of increased prices on goods that were once accessible and affordable. The outdoor cooking product category has seen rising demand across the country, and the increased cost burden caused by the tariffs diminishes access to high-quality American-designed products like those FIREDISC produces.

11.    FIREDISC has always complied with all applicable trade and customs regulations in good faith. However, the unilateral and sudden imposition of these tariffs with little to no opportunity for public comment or meaningful due process places an undue burden on small businesses who have structured their operations around stable, lawful international trade. The absence of any exemption pathway or review process further compounds the problem, effectively denying small businesses a voice in policies that critically impact their survival. The tariffs were enacted in a manner inconsistent with the principles of administrative fairness, and FIREDISC, like many other small enterprises, had no opportunity to adapt or respond through official channels.

12.    FIREDISC is not only a small business, but also a family-owned and operated enterprise. As such, the burden of these tariffs is not diffused across a boardroom or multinational holding company but is felt directly by the individuals who built and invested in this company with personal sacrifice and long-term vision. The lack of institutional safety nets, or access to deep financial reserves, puts family-owned businesses like FIREDISC at the greatest risk during periods of economic uncertainty.

13.    In summary, FIREDISC is not simply facing higher costs, it is confronting an existential threat to its continued operation. The tariffs, as applied, create a situation in which

FIREDISC is penalized for its lawful reliance on international trade and deprived of practical alternatives. Without relief, the company faces not only ongoing financial hardship but also the very real possibility of closure, resulting in lost jobs, lost investment, and the destruction of a family-owned American business.

14.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___July 17, 2025_____, within the United States.

/s/ _____

Geof Taggard

^1 Statistic as reported by secondary sources referencing NFIB data. Full original survey not publicly circulated.

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS

FIREDISC, Inc., *et al.,*

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al.,*

*Defendants.*

Case No. ___25-cv-1134___

## <u>DECLARATION OF JOHN STACY</u>

I, John Stacy, pursuant to 28 U.S.C. § 1746, declare as follows in support of Plaintiffs'

Motion for Summary Judgment in the above-captioned action:

1.      I am the Executive Director of the Game Manufacturers Association ("GAMA"),

a Plaintiff in this matter.

2.      GAMA is an Ohio-based nonprofit trade association for the tabletop game

industry; the industry generates approximately $10 billion in annual revenue.

3.      GAMA has approximately 1,500 members in 49 states, including Texas.

4.      Its members employ tens of thousands of workers—including creators, publishers,

manufacturers, and retailers.

5.      Nearly 80% of tabletop games sold in the U.S. are manufactured abroad. GAMA

members make significant purchases from foreign sources. Most imports are from China, and

GAMA's members also rely on manufacturers in countries including Canada, Poland, Spain, Germany, and the United Kingdom.

6.      GAMA's members have paid substantial and ongoing tariffs on goods that are not reasonably or affordably available from U.S. suppliers. Because of the trafficking tariffs and reciprocal tariffs described in the accompanying  Motion for Summary Judgment, businesses throughout the supply chain face mounting financial strain, including diminished profit margins, reduced product availability, and delayed release schedules. As a result, dozens of GAMA members have announced layoffs and some have ceased operations. In short, these tariffs have damaged and are continuing to damage the health of the tabletop game industry and the economic livelihoods it supports.

7.      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

7/16/2025 | 9:42 AM PDT
Executed on _____, within the United States.

_/s/_

John Stacy

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS

FIREDISC, Inc., *et al.*,

                    *Plaintiffs,*

          v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al.*,

                    *Defendants.*

Case No.  25-cv-1134
         _____

## DECLARATION OF DOUG FOXWORTH

I, Doug Foxworth, pursuant to 28 U.S.C. § 1746, declare as follows in support of

Plaintiffs' Motion for Summary Judgment in the above-captioned action:

1.      I am the President of Ryan Wholesale, Inc., a Plaintiff in this matter.

2.      Ryan Wholesale, Inc. is a Florence, Texas based manufacturer and seller of

structural timber trusses and other fine wood products.

3.      Ryan Wholesale has made and makes significant purchases from sources in Italy.

The products it imports are not reasonably available from a supplier in the United States. These

imports are subject to the reciprocal tariffs described in the accompanying Motion for Summary

Judgment.

4.      Ryan Wholesale has paid increased tariffs because of the Reciprocal Tariffs, and

will continue to pay higher tariffs and suffer economic injuries including lost profits as a result.

5.      On about June 24, 2025, Ryan Wholesale paid $53,994.07 in duties upon arrival of a planer machine. Ex. 1 hereto (Ryan Wholesale Duty email approving $53,994.07 payment for duties).

6.      We expect to suffer increased economic injuries once the suspension on the higher reciprocal tariffs ends July 9.

7.      I declare under penalty of perjury that the foregoing is true and correct. Executed on 7/16/2025, within the United States.

Doug Foxworth

2

**Exhibit 1**

**Subject:** Re: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615
**Date:** Tue, 24 Jun 2025 09:17:49 -0500
**From:** Doug Foxworth <doug@ryanwholesale.com>
**Organization:** Ryan Wholesale, Inc
**To:** Theresa Biggin - Savino Del Bene Philadelphia <theresa.biggin@savinodelbene.com>,
Stacia Heard - Reynolds Savino Del Bene Atlanta
<stacia.heardreynolds@savinodelbene.com>

I approve the duties of $53,994.07



**Doug Foxworth**
*President*
12110 N US Hwy 183
Florence, TX 76527
*"Goods from the Woods"*    254-793-0277

On 6/24/2025 7:50 AM, Theresa Biggin - Savino Del Bene Philadelphia wrote:

Good morning,

This needs to be approved for a continuous bond as the entry is for a large amount. Once that goes through I can send the release. In the mean time, please approve duties of $53994.07. I can provide a draft 7501 if needed once the bond gets approved.

**Thank you,**
Theresa Biggin
Customs Operations Specialist



Savino Del Bene USA. - Philadelphia
1 Warner Ct
Swedesboro, NJ 08085

 www.savinodelbene.com  Follow us on  
 Please consider the environment before printing this e-mail

---

**From:** Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Sent:** Monday, June 23, 2025 2:22 PM
**To:** Theresa Biggin - Savino Del Bene Philadelphia <theresa.biggin@savinodelbene.com>
**Subject:** RE: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

Noted

Thanks
Stacia Heard-Reynolds
Ocean Import

 

**Savino Del Bene ATL**
*235 Southfield Parkway Suite 200*
*Forest Park, GA 30297*
PH: 404-762-9565 x480

2

stacia.heardreynolds@savinodelbene.com

**From:** Theresa Biggin - Savino Del Bene Philadelphia <theresa.biggin@savinodelbene.com>
**Sent:** Monday, June 23, 2025 11:02 AM
**To:** Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Subject:** RE: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

Hello

This needs a single entry bond. Once approved we can clear.

**Thank you,**

Theresa Biggin
Customs Operations Specialist



Savino Del Bene USA. - Philadelphia
1 Warner Ct
Swedesboro, NJ 08085

 www.savinodelbene.com  Follow us on 
Please consider the environment before printing this e-mail

**From:** Theresa Biggin - Savino Del Bene Philadelphia
**Sent:** Monday, June 23, 2025 10:39 AM
**To:** Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Subject:** RE: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

Good morning,

We are working on getting this cleared. Just received the HTS.

**Thank you,**

Theresa Biggin
Customs Operations Specialist



Savino Del Bene USA. - Philadelphia
1 Warner Ct
Swedesboro, NJ 08085

 www.savinodelbene.com  Follow us on  
Please consider the environment before printing this e-mail

**From:** Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Sent:** Monday, June 23, 2025 10:36 AM

**To:** Theresa Biggin - Savino Del Bene Philadelphia <theresa.biggin@savinodelbene.com>
**Subject:** RE: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

Customer Removed

How we looking on this entry
LFD 6/27

Thanks
Stacia Heard-Reynolds
Ocean Import

*Savino Del Bene USA*
*235 Southfield Parkway Suite 200*
*Forest Park, GA 30297*
PH: 404-762-9565 x480
stacia.heardreynolds@savinodelbene.com

---

**From:** Theresa Biggin - Savino Del Bene Philadelphia <theresa.biggin@savinodelbene.com>
**Sent:** Friday, June 20, 2025 11:12 AM
**To:** Doug Foxworth <doug@ryanwholesale.com>; Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Subject:** RE: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

Good afternoon,

I do apologize, but I cannot clear without this information. Unfortunately, you would need to go back to the Manufacturer and ask for a valid HTS.

**Thank you,**

Theresa Biggin
Customs Operations Specialist



Savino Del Bene USA. - Philadelphia
1 Warner Ct
Swedesboro, NJ 08085

🌐 www.savinodelbene.com  Follow us on 🔗  📘 📷
📄 Please consider the environment before printing this e-mail

---

**From:** Doug Foxworth <doug@ryanwholesale.com>
**Sent:** Friday, June 20, 2025 10:16 AM
**To:** Theresa Biggin - Savino Del Bene Philadelphia <theresa.biggin@savinodelbene.com>; Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Subject:** Re: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

How exactly am I supposed to do that?  I've sent your request to the manufacturer and this is what I received.

 **Doug Foxworth**
*President*
12110 N US Hwy 183
Florence, TX 76527
*Since 1995*    "*Goods from the Woods*"    254-793-0277

On 6/20/2025 9:05 AM, Theresa Biggin - Savino Del Bene Philadelphia wrote:

Good morning,

Unfortunately that is not a valid HTS. Please request a valid one.

**Thank you,**
Theresa Biggin
Customs Operations Specialist



Savino Del Bene USA. - Philadelphia
1 Warner Ct
Swedesboro, NJ 08085

 www.savinodelbene.com  Follow us on  
🖨 Please consider the environment before printing this e-mail

**From:** Doug Foxworth <doug@ryanwholesale.com>
**Sent:** Friday, June 20, 2025 9:47 AM
**To:** Theresa Biggin - Savino Del Bene Philadelphia
<theresa.biggin@savinodelbene.com>; Stacia Heard - Reynolds Savino Del Bene Atlanta
<stacia.heardreynolds@savinodelbene.com>
**Subject:** Re: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

From the manufacturer:

**8465 9200 00**          Macchine per spianare o piallare, o per fresare o moda

 **Doug Foxworth**
*President*
12110 N US Hwy 183
Florence, TX 76527
*Since 1995*    "*Goods from the Woods*"    254-793-0277

On 6/20/2025 8:11 AM, Theresa Biggin - Savino Del Bene Philadelphia wrote:

Good morning,

Kind reminder as this arrives today.

**Thank you,**
Theresa Biggin

Customs Operations Specialist



Savino Del Bene USA. - Philadelphia
1 Warner Ct
Swedesboro, NJ 08085

 www.savinodelbene.com  Follow us on 

 

Please consider the environment before printing this e-mail

---

**From:** Theresa Biggin - Savino Del Bene Philadelphia
**Sent:** Thursday, June 19, 2025 11:47 AM
**To:** Doug Foxworth <doug@ryanwholesale.com>; Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Subject:** RE: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

Good morning,

This is the item number provided. The one provided was 8465.92.00. But we need the full 10 digits. I have a website listed below if that helps. But yes, normally it comes from the importer or the manufacturer.

Harmonized Tariff Schedule

**Thank you,**

Theresa Biggin
Customs Operations Specialist



Savino Del Bene USA. - Philadelphia
1 Warner Ct
Swedesboro, NJ 08085

 www.savinodelbene.com  Follow us on 

 

Please consider the environment before printing this e-mail

---

**From:** Doug Foxworth <doug@ryanwholesale.com>
**Sent:** Thursday, June 19, 2025 11:44 AM
**To:** Stacia Heard - Reynolds Savino Del Bene Atlanta <stacia.heardreynolds@savinodelbene.com>
**Cc:** Theresa Biggin - Savino Del Bene Philadelphia <theresa.biggin@savinodelbene.com>; Kadyn Pease - Savino Del Bene Philadelphia <kadyn.pease@savinodelbene.com>
**Subject:** Re: SDB01S518759 [LEF 741002706] RYAN WHOLESALE - HLBU8330615

I'll request the HTS - I don't know what this is - is this to come from the manufacturer?

1. Country of origin is Italy.

2. PAOLETTI ENERGY SRL
   Sede operativa: 32026 BORGO VALBELLUNA (BL) Via dell'Artigiano, 36
   Z.A.- LENTIAI
   Part. IVA: 02202130221 Cod. Fisc: 02202130221



**Doug Foxworth**
*President*
12110 N US Hwy 183
Florence, TX 76527

*Since 1995*    *"Goods from the Woods"*    254-793-0277

On 6/19/2025 10:37 AM, Stacia Heard - Reynolds Savino Del Bene Atlanta wrote:

Hello Doug

See below message from brokerage for this shipment

**Good morning,**

**Please help to provide the below:**

**10 digit HTS**
**Verify the full name and address of the Manufacturer.**
**It needed to be added to the system and it is coming up as invalid.**
**And the country of origin as it is not listed on the commercial invoice.**

**Thank you,**

**Theresa Biggin**
**Customs Operations Specialist**

Thanks
Stacia Heard-Reynolds
Ocean Import

*Savino Del Bene USA*
*235 Southfield Parkway Suite 200*
*Forest Park, GA 30297*
PH: 404-762-9565 x480
stacia.heardreynolds@savinodelbene.com

**From:** Doug Foxworth <doug@ryanwholesale.com>
**Sent:** Thursday, June 19, 2025 10:43 AM

7

**To:** Stacia Heard - Reynolds Savino Del Bene Atlanta
<stacia.heardreynolds@savinodelbene.com>
**Subject:** Re: SDB01S518759 [LEF 741002706] RYAN
WHOLESALE - HLBU8330615

Good morning Stacia - is this arriving the port
Saturday?  I will not have enough time to set a
crane for delivery to our facility for a Saturday
unload.  This is the first I've heard that the
delivery was this close.  The address you have is
correct.
Thanks!
Doug



**Doug Foxworth**
*President*
12110 N US Hwy 183
Florence, TX 76527

*Since 1995*     *"Goods from the Woods"*     254-793-0277

On 6/19/2025 9:05 AM, Stacia Heard - Reynolds
Savino Del Bene Atlanta wrote:

>    Hello Doug
>
>    Can you please confirm the delivery
>    address for this shipment
>
>    It will arrive on SAT
>
>    **RYAN WHOLESALE**
>    **12110 N US HWY 183**
>    **Florence, TX 76527**
>
>    Thanks
>    Stacia Heard-Reynolds
>    Ocean Import
>
>    *Savino Del Bene USA*
>    *235 Southfield Parkway Suite 200*
>    *Forest Park, GA 30297*
>    PH: 404-762-9565 x480
>    stacia.heardreynolds@savinodelbene.com
>
>    This message is for the recipients
>    only. If you receive it in error,
>    please notify the sender and
>    delete it together with any
>    attachments. Please refer to our
>    client-supplier disclosure on

https://www.savinodelbene.com/en/privacy/

This message is for the recipients only. If you receive it in error, please notify the sender and delete it together with any attachments. Please refer to our client-supplier disclosure on https://www.savinodelbene.com/en/privacy/

This message is for the recipients only. If you receive it in error, please notify the sender and delete it together with any attachments. Please refer to our client-supplier disclosure on https://www.savinodelbene.com/en/privacy/

This message is for the recipients only. If you receive it in error, please notify the sender and delete it together with any attachments. Please refer to our client-supplier disclosure on https://www.savinodelbene.com/en/privacy/

This message is for the recipients only. If you receive it in error, please notify the sender and delete it together with any attachments. Please refer to our client-supplier disclosure on https://www.savinodelbene.com/en/privacy/

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

---

FIREDISC, Inc., *et al.*,

        Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

        Defendants.

Civil Action No. 25-cv-1134

---

**[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiffs' Motion for Summary Judgment.

Having considered the Motion, it is hereby:

1. The Court **GRANTS** Plaintiffs' Motion for Summary Judgment.

2. The Court **DECLARES** that the International Emergency Economic Powers Act (IEEPA) 50 U.S.C. Sec. 1701 does not grant tariff authority to the Executive Branch.

3. The Court **DECLARES** pursuant to 28 U.S.C. § 2201(a) that the following Executive Orders are unlawful and unconstitutional, and that all resulting modifications to the Harmonized Tariff Schedule of the United States (HTSUS), are unlawful: E.O. 14,193 (Feb. 1, 2025), E.O. 14,194 (Feb. 1, 2025), E.O. 14,195 (Feb. 1, 2025), E.O. 14,197 (Feb. 3, 2025), E.O. 14,198 (Feb. 3, 2025), E.O. 14,228 (Mar. 3, 2025), E.O. 14,231 (Mar. 6, 2025), E.O. 14,232 (Mar. 6, 2025), E.O. 14,257 (Apr. 2, 2025), E.O. 14,259 (Apr. 8, 2025), E.O. 14,266 (Apr. 9, 2025), E.O. 14,298 (May 12, 2025), E.O. 14,316 (July 7, 2025).

4. The Court **ORDERS**, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2), that all HTSUS modifications made to implement the listed Executive Orders and are **SET ASIDE** and **VACATED**.

The Clerk of Court shall enter judgment in favor of Plaintiffs and close the case.

**IT IS SO ORDERED.**

DATED: _____     _____
                                                Judge